UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL HYDE<br>Plaintiff. | )<br>)<br>)<br>) |
| v. | )  Civil Action No. 04-12429-RWZ |
| STATE OF MASSACHUSETTS ET AL.,)<br>Defendants. | )<br>) |

## PLAINTIFF'S MEMORANDOM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The plaintiff, Michael J Hyde, submits this memorandum in opposition to defendants' motion
to dismiss. Under Rule 12(b)(6), a motion to dismiss for failure to state a claim can only be granted
if it is clear beyond doubt that the plaintiff can prove no set of facts in support of his claim that
would entitle him to relief. *Perry v. McGinnis,* 209 F.3d 597, 602 (6th Cir. 2000). The court must
accept all of the plaintiff's factual allegations as true and must construe the complaint in the light
most favorable to the plaintiff. *Id.* Pursuant to the case law in the Sixth Circuit Court of Appeals,
the court must scrutinize with special care any motion for dismissal of a complaint filed under a
civil rights statute.

Plaintiff, Michael J. Hyde, respectfully moves this Honorable Court to view the following court
statements. 1ˢᵗ, COMMONWEALTH of Massachusetts vs. MICHAEL J. HYDE:

MARSHALL, C.J. (dissenting, with whom Cordy, J., joins). In the early
morning hours of Sunday, March 3, 1991, George Holliday was awakened by a
commotion outside his apartment. From his window he saw an African-American
man being beaten by uniformed police officers. Holliday did more than watch.

Page 1

He recorded on videotape (with sound) the officers' clubbing the man with fifty-six baton strokes, and kicking him viciously about the head and body.[13] The graphic videotape of the arrest of Rodney King was subsequently viewed on television by millions of Americans, causing a public outcry and leading to a comprehensive investigation of the use of excessive force by the Los Angeles police department. The videotape also served as the catalyst for the formation of The Christopher Commission, established to investigate the incident. The commission concluded that police misconduct was a serious problem within the department, and that major reform efforts were needed. The commission wrote of the importance of the Holliday videotape:

> "Our Commission owes its existence to the George
> Holliday videotape of the Rodney King incident. Whether
> there even would have been a Los Angeles Police
> Department investigation without the video is doubtful,
> since the efforts of King's brother . . . to file a
> complaint were frustrated, and the report of the
> involved officers was falsified."[14]

The videotaped events occurred in Los Angeles. Had they occurred in Massachusetts, under today's ruling Holliday would have been exposed to criminal indictment rather than lauded for exposing an injustice.[15] That can be the result only if the Legislature intended the criminal statute. G. L. c. 272, ? 99, to apply in these circumstances. It did not. I therefore respectfully dissent.

There is nothing in the legislative history of the wiretapping statute, G.
L. c. 272, ? 99, in the preamble to the legislation, or in the language of
the statute that compels the result reached by the court today. The
legislative history makes clear that the intent of the statute, as amended
in 1968,[16] is twofold. First, the amendments were designed to authorize
and to regulate the government's use of wiretaps and other surveillance
devices. See Interim Report of the Special Commission on Electronic
Eavesdropping, 1968 Senate Doc. No. 1132, at 1-2 (1968 Report) (commission
"desires close judicial supervision over all aspects of the process of
eavesdropping and wiretapping as it is performed by law enforcement
officers"). Supervision of governmental surveillance and eavesdropping was

viewed as necessary to "eliminate the possibility of abuse and add to the
public's confidence in the manner in which this statute is employed by law
enforcement officials." 1968 Report at 8.

Second, the amendments were intended to protect the privacy of citizens by
regulating nongovernmental "surveillance," particularly in two circumstances
identified by the Special Commission as posing serious risks to that
privacy: (i) the Legislature was concerned about the newly discovered
practice of private telephone companies' eavesdropping on the conversations
of its private customers[17]; and (ii) the commission heard evidence that
new technology had made "eavesdropping devices" or "bugs," such as
subminiature transmitters, "readily available" to "private investigators"
and "private parties." Even if detected, the commission cautioned, "one can
never learn the identify of the eavesdropper." Interim Report of the Special
Commission on Electronic Eavesdropping, 1967 Senate Doc. No. 1198 at 3 (1967

Report). The commission recommended that, to protect the privacy of
citizens, individuals be prohibited from using these "wiretapping and
eavesdropping devices" to record their private conversations.[18] There is
no hint in the legislative history that the Legislature contemplated the
circumstances at issue in this criminal case: the tape recording of an
encounter on a public way between a citizen and a police officer engaged in
his official duties.[19]

The 1968 amendments to the wiretapping statute, St. 1968, c. 738, ? 1, at
issue here, were enacted shortly after the special commission's report, and
reflect these same two purposes. First, the statute authorized the police to
engage in secret electronic surveillance of citizens suspected of organized
crime: The statutory preamble notes that "[n]ormal investigative procedures
are not effective" in combating the "increasing activities of organized
crime" and that "law enforcement officials must be permitted to use modern
methods of electronic surveillance . . . when investigating these organized
criminal activities." Id.[20]

Second, the Legislature noted that the "uncontrolled development and
unrestricted use of modern electronic devices" posed grave dangers to the
"privacy of all citizens of the commonwealth." With these twin objectives in
mind, the Legislature placed substantial restrictions on "surveillance" and
"eavesdropping" by government officials. See Commonwealth v. Gordon, 422
Mass. 816, 833 (1996) ("It is apparent from the preamble that the
legislative focus was on the protection of privacy rights and the deterrence
of interference therewith by law enforcement officers' surreptitious

eavesdropping as an investigative tool"). The Legislature also restricted
"surveillance" and "eavesdropping" by private individuals to protect those
same privacy interests. See Commonwealth v. Jackson, 370 Mass. 502, 507
(1976) (statutory language and legislative policy of "protecting the privacy

of our citizens"). To that end the Legislature both prohibited
"interceptions," and provided a civil remedy for any person "aggrieved" by
such "interceptions," described by the Legislature as one who "ha[s]
standing to complain that his . . . privacy was invaded in the course of an
interception." G. L. c. 272, ? 99 B 6 and Q. The legislative intent as
reflected in the statutory language is explicit: to protect the privacy
interests of citizens. While the statutory language enacted to accomplish
these purposes can be broadly read, there is no suggestion that the
Legislature had in mind outlawing the secret tape recording of a public
exchange between a police officer and a citizen.

The criminal conviction of Michael Hyde is (apparently) the first time that
a citizen of Massachusetts has been convicted because he tape recorded an
exchange with a police officer performing an official function in a public
place in the presence of a third party, potentially within the sight and
hearing of any passerby.[21] Now to hold, as the court does, that a police
officer possesses a privacy interest in statements he makes as a public
officer effectuating a traffic stop sets the jurisprudence of this
Commonwealth apart from all others.

Many States have wiretapping statutes similar to the one enacted in 1968 in
Massachusetts.[22] In only one reported decision has a State attempted to
Page 5

indict a citizen in circumstances similar to those in this case. The attempt
was summarily rejected. In State v. Flora, 68 Wash. App. 802 (1992), the
court overturned a conviction obtained in circumstances nearly identical to
these and under a wiretapping statute similar to the one at issue here. The
Flora court rejected as "wholly without merit" the view now adopted by this
court. Id. at 806. The court "decline[d] the State's invitation" to
transform its wiretapping statute "into a sword available for use against
individuals by public officers acting in their official capacity." Id. at
808.[23]

This court's attempt to distinguish State v. Flora, supra, as "inapposite"
because the "Washington electronic surveillance statute prohibits only the
secret recording of private conversations" is not persuasive. Ante at n.6.
[24] Like its Washington counterpart, the Massachusetts statute protects, as
it was intended to, the privacy of citizens. See G. L. c. 272. ? 99 B 6
("aggrieved person" is one whose "privacy was invaded in the course of an
interception").[25] Both the language of the statute and its legislative
history make clear that the Legislature was concerned only with protecting
the secret recording of conversations in which there was a legitimate
expectation of privacy. None exists here.

The purpose of G. L. c. 272. ? 99, is not to shield public officials from
exposure of their wrongdoings. I have too great a respect for the
Legislature to read any such meaning into a statute whose purpose is plain.

and points in another direction entirely. Where the legislative intent is
explicit, it violates a fundamental rule of statutory construction to reach

a result that is plainly contrary to that objective. See Commonwealth v. Gordon, supra at 832-833 (court declined to read wiretapping statute "literally" in "absence of more specific statutory language" that broad definition of interception outlawed unconsented audiotaping of booking procedures, noting that "in light of the preamble, we are unwilling to attribute that intention to the Legislature"). See Commissioner of Pub. Works v. Cities Serv. Oil Co., 308 Mass. 349, 360 (1941) (statutes are to be interpreted "in the light of the Constitution and of the common law, to the end that they be held to cover the subjects presumably within the vision of the Legislature" and "be not stretched" to "comprehend matters not within the principle and purview on which they were founded"). "The public has an interest in knowing whether public servants are carrying out their duties in an efficient and law-abiding manner." Attorney Gen. v. Collector of Lynn, 377 Mass. 151, 158 (1979). To hold that the Legislature intended to allow police officers to conceal possible misconduct behind a cloak of privacy requires a more affirmative showing than this statute allows.

In our Republic the actions of public officials taken in their public capacities are not protected from exposure. Citizens have a particularly important role to play when the official conduct at issue is that of the

police. See Rotkiewicz v. Sadowsky, 431 Mass. 748, 754 (2000) (recognizing importance of "public discussion and public criticism directed toward the performance" of police officers). Their role cannot be performed if citizens must fear criminal reprisals when they seek to hold government officials responsible by recording -- secretly recording on occasion -- an interaction

page 7

between a citizen and a police officer.

The court suggests, ante at , that a different reading would permit
"untrammeled interception of communications" of government officials by
everyone and anyone. That concern is misplaced. There is a difference in
kind, well recognized in our jurisprudence, between police officers, who
have the authority to command citizens, take them into custody, and to use
physical force against them, and other public officials who do not possess
such awesome powers.[26] We hold police officers to a higher standard of
conduct than other public employees, and their privacy interests are
concomitantly reduced. See, e.g., O'Connor v. Police Comm'r of Boston, 408
Mass. 324, 328-329 (1990) ("public confidence in the police is a social
necessity and is enhanced by procedures that deter [unlawful police
conduct]"); Broderick v. Police Comm'r of Boston, 368 Mass. 33, 42 (1975),
quoting Gardner v. Broderick, 392 U.S. 273, 277-278 (1968) (police officer
"is a trustee of the public interest, bearing the burden of great and total
responsibility to his public employer"). We hold officers to this higher

standard of conduct, fully confident that, in most cases, they will meet
that standard, and there is no "implicit" suggestion to the contrary. Ante
at . It is the recognition of the potential for abuse of power that has
caused our society, and law enforcement leadership, to insist that citizens
have the right to demand the most of those who hold such awesome powers.[27]

The court's ruling today also threatens the ability of the press -- print
and electronic -- to perform its constitutional role of watchdog. As the

court construes the Massachusetts wiretapping statute, there is no
principled distinction to explain why members of the media would not be held
to the same standard as all other citizens. See, e.g., Associated Press v.
NLRB, 301 U.S. 103, 122-133 (1937) ("The publisher of a newspaper has no
special immunity from the application of general laws. He has no special
privilege to invade the rights and liberties of others"). See also Branzburg
v. Hayes, 408 U.S. 665, 682 (1972) ("It is clear that the First Amendment
[to the United States Constitution] does not invalidate every incidental
burdening of the press that may result from the enforcement of civil or
criminal statutes of general applicability"). The statute, on its face,
makes no exception for members of the media or anyone else. Had Michael
Hyde, the defendant in this case, been a news reporter he could have faced
the same criminal consequences that the court now sanctions.[28] If the
statute reaches actions by police officials acting in their public

capacities in the plain view of the public, the legitimate news gathering of
the media is most assuredly implicated.

I would reverse the conviction. MARSHALL, C.J. (dissenting, with whom
Cordy, J., joins).

2nd case involves   United States Court of Appeals for the Ninth Circuit
**Date:** 10/28/2004

**Case Style:** Anthony L. Johnson v. W.J. Hawe, etc.

**Case Number:** 03-35057

**Judge:** Kim McLane Wardlaw,

**Court:** United States Court of Appeals for the Ninth Circuit on appeal from the Western

District of Washington

## Plaintiff's Attorney:

R. Stuart Phillips, Poulsbo, Washington, for the plaintiff appellant.

## Defendant's Attorney:

Ray P. Cox, Forsberg & Umlauf, P.S., Seattle, Washington, for the defendants-appellees.

## Description:

In this section 1983 action Anthony L. Johnson appeals the grant of summary judgment predicated on qualified immunity for his arrest by the City of Sequim Police Chief Byron Nelson for a violation of Washington's Privacy Act, Wash. Rev. Code § 9.73.030 (the "Privacy Act"). Because it was clearly established under Washington law at the time of the arrest that recording a police officer in the performance of his public duties was not a violation of the Privacy Act and it was unreasonable for Chief Nelson to believe otherwise, we hold that the Chief is not entitled to qualified immunity. Moreover, because Chief Nelson could not have had any reasonable expectation of privacy in the communications by others over the police radio dispatch system, which was the basis for his Privacy Act arrest of Johnson, the arrest violated Johnson's Fourth Amendment right to be free of arrest without probable cause. And because Johnson submitted evidence supporting

14927 JOHNSON v. CITY OF SEQUIM his claim of Monell liability against the City, summary judgment was not warranted on any ground relied upon by the district court. We therefore reverse and remand for further proceedings.

I

The undisputed facts show that on January 28, 2000, Johnson was videotaping several of his friends at Sequim's public skateboard park when he noticed Chief Nelson drive up to the park in his patrol vehicle. Chief Nelson, who was on duty and had come to the park to look for a missing juvenile, stopped his patrol car in the park's parking lot about seventy-five feet away from where Johnson was standing on an elevated cement ramp. From this distance, Chief Nelson observed Johnson videotaping him as he sat in his vehicle with his driver's side window rolled down. After a short time, Johnson stopped recording Chief Nelson and approached the car. As Johnson approached, Chief Nelson's police radio "was operating" and he was "dialing [his] cellular phone" to contact dispatch to obtain a description of the runaway he was attempting to locate. Johnson resumed videotaping when he reached the rear of the car. As Johnson came around to the passenger side of the car, Chief Nelson rolled down the passenger window, deactivated his cellular phone, and asked Johnson "What do you think you're doing?" Although Johnson stopped recording

Page 10

Chief Nelson, he continued to point his video camera at Chief Nelson, who twice told Johnson to stop because Johnson "did not have [ ] permission to record [him] and . . . it was a violation of the law to record conversations without consent." After the second warning, Chief Nelson got out of his car and "contacted" with Johnson, physically struggling with him to obtain the video camera. With the assistance of another officer, whom he had called for backup, Chief Nelson placed Johnson under arrest and transported him to the Clallam County Jail in Port Angeles.

After Johnson had spent three days in county jail, prosecutors filed a criminal complaint against him, charging one

14928 JOHNSON v. CITY OF SEQUIM

count of recording communication without permission, in violation of the Privacy Act, and one count of resisting arrest. Prosecutors also moved for a determination of probable cause, based solely upon a declaration from Chief Nelson that Johnson videotaped him "while [he] was making telephone contact with dispatch in an attempt to verify juvenile runaway information."

Although the state court found probable cause for the arrest, Johnson was released and the charges were dropped. Nearly two months later, prosecutors again filed charges against Johnson, this time for "attempted recording communication without permission" and for resisting arrest.

On May 10, 2000, Judge Coughenour of the Clallam County District Court dismissed the charges against Johnson.

Judge Coughenour found that Chief Nelson was not engaged, by cellular phone or police radio, in any conversation or communication with anyone while Johnson was recording him, and that Johnson therefore could not have "inten[ded] to record a conversation that [was not] occurring." Moreover, Judge Coughenour found that even if Chief Nelson had been involved in a communication in his vehicle, there was no expectation of privacy because he had voluntarily exposed any such communication to the public by parking his vehicle in a public place with the windows rolled down.

On June 16, 2000, Johnson filed this action pursuant to 42 U.S.C. § 1983 action against the City of Sequim, Chief Nelson, Sequim's Mayor, several Doe officers, Clallam County, and the County Sheriff, seeking a declaration that he had been arrested, incarcerated, and prosecuted in violation of his First and Fourth Amendment rights. He also sought injunctive relief, monetary damages, and attorney's fees pursuant to 42 U.S.C. § 1988(b). Chief Nelson and the other individual defendants filed counterclaims against Johnson for malicious prosecution under Wash. Rev. Code § 4.24.350(2). Ruling on cross motions for summary judgment on Johnson's claims, Magistrate Judge Arnold granted judgment for defendants and

Page11

dismissed Johnson's claims. After defendants voluntarily dismissed their counterclaims, Johnson appealed.

II

We review de novo the district court's decision to grant or deny summary judgment. See United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir. 2003). Viewing the evidence in the light most favorable to the nonmoving party, we determine whether any genuine issue of material fact exists and whether the district court correctly applied the law. Id. We review de novo the district court's finding of qualified immunity. Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002).

III

**"The elements of a section 1983 action are: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States."** (Emphasis Added by MoreLaw) Alford v. Haner, 333 F.3d 972, 975-76 (9th Cir. 2003) (citation and internal quotation marks omitted). It is undisputed that Chief Nelson was acting under color of state law when he arrested Johnson. As to the second element of his section 1983 claim, Johnson asserts that Chief Nelson arrested him without probable cause, in violation of the Fourth Amendment. See Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause exists when the arresting officer has "a reasonable belief, evaluated in light of the officer's experience and the practical considerations of everyday life, that a crime has been, is being, or is about to be committed."; Hopkins v. City of Sierra Vista, 931 F.2d 524, 527 (9th Cir. 1991) (citation and internal quotation marks omitted). Johnson argues that there was no reasonable basis for Chief Nelson to believe his videotaping was criminal under the Privacy Act because (1) the Act does not apply to

recordings of communications that police officers make "in the course of performing their official and public duties[,]" State v. Flora, 845 P.2d 1355, 1357 (Wash. Ct. App. 1992); and (2) there was no reasonable expectation of privacy in the police radio communications in any event because they were "knowingly expose[d]" to the public, Katz v. United States, 389 U.S. 347, 351 (1967). Defendants assert they are entitled to qualified immunity.

The first inquiry in conducting a qualified immunity analysis is: **"Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"** (Emphasis Added by MoreLaw) Saucier v. Katz, 533 U.S. 194, 201 (2001). "In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth

principles which will become the basis for a holding that a right is clearly established. This is the process for the law's elaboration from case to case." Id. "[I]f a violation could be made out . . . , the next, sequential step is to ask whether the right was clearly established." Id. This second inquiry "must be undertaken in light of the specific context of the case," to discern whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 201, 202. If the answer to both of these inquiries is yes, qualified immunity may still be appropriate if the officer had a "reasonable, but mistaken, belief[ ] as to the facts establishing the existence of probable cause . . . [and] the legality of [his] actions." Id. at 206.

A

Defendants do not assert either that Chief Nelson had a privacy interest in his conversation with Johnson during their encounter or that he was involved in a private cellular phone conversation while Johnson videotaped him. Thus, the sole basis for the district court's qualified immunity determination is that Chief Nelson's "communications with others on his

14931 JOHNSON v. CITY OF SEQUIM

police radio" were private, and thus he had a reasonable belief that probable cause existed to arrest Johnson for recording those communications without his consent.

[1] Washington's Privacy Act provides:

(1) Except as otherwise provided in this chapter, it shall be unlawful for any individual . . . to intercept, or record any:

(a) Private communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication;

(b) Private conversation, by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated without first obtaining the consent of all the persons engaged in the conversation.

Wash. Rev. Code § 9.73.030(1)(a)-(b). It is well-established that non-private conversations and communications are "outside the purview of the [Privacy Act,]" State v. D.J.W., 882 P.2d 1199, 1202 (Wash. Ct. App. 1994), and that "private" has its "ordinary and usual meaning" under the Act, i.e., " 'belonging to one's self . . . secret . . . intended only for the persons involved (a conversation) . . . holding a confidential relationship to

something . . . a secret message: a private communication . . . secretly: not open or inpublic.' " State v. Forrester, 587 P.2d 179, 184 (Wash. Ct. App. 1978) (quoting Webster's Third New International Dictionary (1969) (alterations in original)). To determine whether a conversation is private, Washington courts "consider the intent or reasonable

14932 JOHNSON v. CITY OF SEQUIM

expectations of the participants as manifested by the facts and circumstances of each case." Id. "A person's right to keep private his affairs including his conversation depends on whether he has a reasonable expectation of privacy at the time and under the circumstances involved." State v. Bonilla, 598 P.2d 783, 785-86 (Wash. Ct. App. 1979) (citing Jeffers v. City of Seattle, 597 P.2d 899, 907 (Wash. Ct. App. 1979)). This test is similar, if not identical, to the reasonable expectation of privacy test set forth for purposes of Fourth Amendment analysis in Katz, 389 U.S. 347. As Katz held,

[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. Katz, 389 U.S. at 351 (citations omitted).

[2] The Washington Supreme Court has determined that the Act's purpose is "to protect individuals from the disclosure of any secret illegally uncovered by law enforcement." State v. Fjermestad, 791 P.2d 897, 902 (Wash. 1990); see also id. ("[T]he State's privacy act . . . deliberately places the court system between the police and private citizen to protect against this type of [electronic eavesdropping]."). Accordingly, Washington courts have refused "to transform the privacy act into a sword available for use against individuals by public officers acting in their official capacity." Flora, 845 P.2d at 1357-58 (rejecting police officers' assertion of a privacy interest under the Act in statements they made on a public thoroughfare while effectuating an arrest). (In a recent section 1983 case involving the tape recording of a traffic stop, we quoted with approval the district court's jury instruction that:

"It is not a violation of the Washington Privacy Act to tape-record a police officer in the performance of

14933 JOHNSON v. CITY OF SEQUIM

an official function on a public thoroughfare. Such conversations are not 'private' under the Privacy Act. This rule of law was clearly established by Washington Courts in 1992 in the case of State of Washington v. Flora."

Alford, 333 F.3d at 977. This instruction was correctly based upon Flora and a subsequent

Page 14

Washington Supreme Court case that recognized "a conversation on a public thoroughfare in the presence of a third party and within the sight and hearing of passersby is not private" under the Act. State v. Clark, 916 P.2d 384, 392 (Wash. 1996) (discussing Flora, 845 P.2d at 1355).

"Determining whether a particular conversation is private is a question of fact. However, where the pertinent facts are undisputed and reasonable minds could not differ on the subject, the issue of whether a particular conversation is private may be determined as a matter of law." D.J.W., 882 P.2d at 1202 (citations omitted). The district court ruled as a matter of law that the police radio communications were private based upon Chief Nelson's reasonable expectation of privacy and the fact that he "was not engaging in [them] in a public way." We disagree for three reasons.

[3] First, the Privacy Act does not criminalize the recording of a "police officer in the performance of an official function on a public thoroughfare." Alford, 333 F.3d at 977 (citing the district court's jury instructions). The district court's limitation of Flora's application to communications "involv[ing] the arrest subject . . . made in the presence of third parties with no expectation of privacy" was in error. Flora's underlying principle is that the Privacy Act is not to be "transform- [ed] . . . into a sword available for use against individuals by public officers acting in their official capacity." Flora, 845 P 2d at 1358. The language "public officers acting in their official capacity" does not exclude any conduct other than an actual arrest, but encompasses other conduct that is public and

14934 JOHNSON v. CITY OF SEQUIM

official. See id. at 1357 ("The State urges us to adopt the view that public officers performing an official function on a public thoroughfare in the presence of a third party and within the sight and hearing of passersby enjoy a privacy interest which they may assert under the statute. We reject that view as wholly without merit."). In Alford itself, we applied Flora to the recording of statements made by police in public during a traffic stop and found there was not probable cause to arrest under the Privacy Act. 333 F.3d at 976, 978. It is undisputed that Johnson recorded Chief Nelson while he was on duty performing an official function in a public place. Under Flora and Alford, Johnson did not violate the Privacy Act when he recorded this official, public activity.

[4] Second, there was no reasonable expectation of privacy in the police radio communications because Chief Nelson "knowingly expose[d]" them to the public. Katz, 389 U.S. at 351. It is undisputed that (1) Chief Nelson's police radio "was operating" as he sat in his police cruiser in the parking lot of a public park with his driver's side window rolled down; (2) Chief Nelson was aware that Johnson was videotaping him as Johnson approached the vehicle; (3) Chief Nelson did not roll up his window as Johnson approached; and (4) when Johnson reached the passenger side of the cruiser, Chief Nelson rolled down that window to speak to Johnson. This conduct does not reflect an intent to keep the radio communications private; it belies any assertion that the Chief expected the radio communication to remain private. With his window rolled down in a public parking

page 15

lot, Chief Nelson's police radio communications were "within the . . . hearing of passersby" such as Johnson and other members of the public, and thus could not be private under the Act. State v. Clark, 916 P.2d at 392. If Chief Nelson had wished to keep the radio communications from the public, he should have rolled up the driver's window, and refrained from rolling down a second window, where Johnson was standing next to the car with his video camera pointed inside.

14935 JOHNSON v. CITY OF SEQUIM

[5] Third, there is no reasonable expectation of privacy in communications over police dispatch radio in any event because those communications are knowingly exposed to the public by virtue of their transmission. For example, addressing the question "whether the participants in a conversation between 911 Central Dispatch and law enforcement or fire personnel have a reasonable expectation that their conversations are of a private nature [under the Privacy Act]," the Washington Attorney General stated in a 1988 Opinion: First, we understand that a large percentage of conversations between 911 Central Dispatch and law enforcement or firefighting officers is radio communication, commonly monitored by other officers and by private citizens owning devices that scan the radio frequencies used by police and fire agencies. In our opinion, the participants in a conversation that can be readily overheard and recorded by the general public do not have a reasonable expectation of privacy in their conversation.

Second, even where a conversation is not "public" in that it is not monitored or heard by the public, it may be "public" in that the subject of the conversation is strictly of a public business nature. We assume that virtually all conversations between 911 Central Dispatch and public officers are official, public business conversations.

Op.Wash. Att'y Gen. No. 11 (1988), available at 1988 WL 404817, at *2-3. In a factually similar case, Oregon's intermediate appellate court similarly ruled:

[T]he trial court erred in its conclusion that the [police radio] broadcast was not "for the use of the general public." The police had no property or privacy interest in it. It is undisputed that it was transmitted on a frequency that was accessible to the

14936 JOHNSON v. CITY OF SEQUIM

public, who could listen without subscription, payment or other hindrance. The scanner that defendant used to receive the message was for sale at K-Mart and Radio Shack stores. Although the police intended that the broadcast be for police use, the message was not coded or scrambled, and the police knew that the public could listen to it. The public could understand the content of the message without the use of special equipment, even though police officers were identified by number rather than by name. The broadcast was "for the use of the general public" within the meaning of the exception in ORS 165.540(4). Defendant committed no crime when she tape recorded the police radio broadcast.

Page 16

State v. Bichsel, 790 P.2d 1142, 1144 (Or. Ct. App. 1990); cf. United States v. Basey, 816 F.2d 980, 993 n.21 (5th Cir. 1987) ("And, apart from specific statutory protections, there is no reasonable expectation of privacy in broadcasts over the public airwaves which are exposed to everyone in the area having a radio tuned to the same nonexclusive channel.") (citing United States v. Hoffa, 436 F.2d 1243, 1247 (7th Cir. 1970); Edwards v. Bardwell, 632 F. Supp. 584, 589 (M.D. La.), aff'd 808 F.2d 54 (5th Cir. 1986) (stating that there is no reasonable expectation of privacy in a communication broadcast via radio). Because the communications over Chief Nelson's police radio could be commonly monitored, overheard, and recorded by other officers and private citizens owning scanning devices, there was no reasonable expectation of privacy in those communications.

[6] Therefore we conclude that Johnson was arrested without probable cause in violation of the Fourth Amendment because his conduct was not criminal under the Act.

B

We next examine whether the contours of Johnson's Fourth Amendment right in this context were sufficiently clearly

14937 JOHNSON v. CITY OF SEQUIM

established at the time of Johnson's arrest to defeat the Chief's claim of qualified immunity. We hold that the law was sufficiently established so that Chief Nelson reasonably should have known that he had no lawful basis to arrest Johnson for violating the Privacy Act.

[7] The principles of Flora and its progeny were wellestablished at the time of Johnson's arrest. At the very least, these cases stand for the following two propositions: (1) "public officers performing an official function on a public thoroughfare in the presence of a third party and within the sight and hearing of passersby [do not] enjoy a privacy interest which they may assert under the statute"; and (2) the Privacy Act may not be "transform[ed] . . . into a sword available for use against individuals by public officers acting in their official capacity." Flora, 845 P.2d at 1357-58. Any reasonable officer should have understood these rules to preclude Johnson's arrest under the circumstances. Although Flora involved officer statements made during an arrest, no subsequent authority limited its reach to those facts. Moreover, Flora's plain language suggests a broader application sufficient to preclude Chief Nelson from arresting Johnson for recording him during the performance of his official duties in public. Moreover, in light of the many Washington cases dealing with unlawful arrests under the Privacy Act, a reasonable police officer should have been aware of the 1998 Washington Attorney General's Opinion No. 11, which determines that communications over police dispatch radio are not private. See 1988 WL 404817, at *2-3. Finally, even if these two points were not sufficiently clear to preclude Johnson's arrest, any reasonable officer should have known under the wellestablished precedent of Katz that there could be no reasonable expectation of privacy in the police radio transmissions which Chief Nelson knowingly exposed to the public through his open car windows. No

page 17

exigent circumstances existed in this case that could justify a reasonable mistake on the

part of chief Nelson. See Saucier, 533 U.S. at 206.

14938 JOHNSON v. CITY OF SEQUIM

[8] Therefore defendants are not entitled to qualified immunity.

The district court's entry of summary judgment on that basis is reversed. 1

IV

[9] The district court rejected Johnson's municipal liability claim under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. at 658 (1978), on the basis that Johnson "had set forth no evidence to support the establishment of a policy or custom" which the Chief followed in arresting Johnson. This ruling is incorrect because Johnson submitted the declaration of law enforcement expert Alan H. Baxter. Baxter opined that the Sequim Police Department's "self-training" program, which assigned responsibility to the individual officer for keeping abreast of recent court decisions involving law enforcement, amounted to a "failure to train" Sequim police officers about enforcement of suspected violations of the Privacy Act.

Under City of Canton v. Harris, 489 U.S. 378, 380 (1989), the Department's failure to train its officers about the Privacy Act may amount to "deliberate indifference" toward unlawful arrests under its provisions. As the Supreme Court has explained:

1 Summary judgment was also inappropriate on a second ground. A genuine issue of material fact exists as to whether Johnson recorded any conversation or communication at all. As Judge Coughenour pointed out when he dismissed the charges against Johnson, the evidence establishes only that Chief Nelson's police radio "was operating" while Johnson videotaped him. In addition, Johnson submitted a videotape in support of his motion for summary judgment which reveals Chief Nelson sitting silently in his police cruiser while he supposedly was engaged in conversation over his cellular phone. Viewed in the light most favorable to Johnson, this evidence suggests there was no conversation or communication taking place while Johnson videotaped Chief Nelson, and thus there was no reasonable basis to arrest him for recording a communication that did not take place.

14939 JOHNSON v. CITY OF SEQUIM

[A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice — namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an

page 18

inference of causation — that the municipality's indifference led directly to the very

consequence that was so predictable.

Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 409-10 (discussing Canton). In light of the many Washington cases addressing enforcement of the Privacy Act by public officers performing official duties, Johnson's evidence creates at least a genuine issue as to whether "self-training" in this context amounted to deliberate indifference. [10] In its municipal liability analysis, the district court failed to address either Johnson's "failure to train" theory of municipal liability or expert Baxter's supporting opinions.

The district court also did not rule on defendants' motion to strike expert Baxter's declaration for Johnson's alleged failure to comply with his expert witness disclosure and discovery obligations under Federal Rule of Civil Procedure 26. We decline to reach these issues in the first instance, and direct the district court to address them upon remand.

V

The district court erroneously dismissed Johnson's state law outrage claim for failure to state a prima facie case, ruling: "[T]here is nothing unusual about the acts of the defen-14940 JOHNSON v. CITY OF SEQUIM dants as law enforcement officers, nor is there any indication that the acts viewed in a light most favorable to [Johnson] would generate severe emotional distress. No reasonable juror could find otherwise."

[11] The dismissal was in error. "To state a claim for the tort of outrage or intentional infliction of emotional distress, a plaintiff must show '(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress.' " Seaman v. Karr, 59 P.3d 701, 710 (Wash. Ct. App. 2002) (quoting Birklid v. Boeing Co., 904 P.2d 278 286 (Wash. 1995). The determination of whether conduct is outrageous is ordinarily a jury question, but the court must initially "determine if reasonable minds could differ on whether the conduct was so extreme as to result in liability." Id. In light of our holding that Chief Nelson arrested Johnson for recording "private" communications for which there was no reasonable expectation of privacy, reasonable minds could surely differ on whether that conduct amounted to more than "mere annoyance, inconvenience, or normal embarrassment," and the issue must go to a jury. Brower v. Ackerley, 943 P.2d 1141, 1149 (Wash. Ct. App. 1997).

VI

Johnson also seeks a declaration that Wash. Rev. Code § 4.24.350, the basis for defendants' malicious prosecution counterclaims, violates the First and Fourth Amendments because it affords greater protection from unfounded lawsuits to public officials than is afforded to other citizens. Johnson's claim is moot because defendants dismissed their malicious prosecution claims and represented at oral argument that they

would not pursue those claims in the future. Thus there is no actual controversy between the parties with respect to any malicious prosecution claim under § 4.24.350, and we affirm the district court's dismissal of Johnson's constitutional challenges to the statute. See, e.g., Bernhardt v. County of Los

14941 JOHNSON v. CITY OF SEQUIM

Angeles, 279 F.3d 862, 871 (9th Cir. 2002); Seven Words LLC v. Network Solutions, 260 F.3d 1089, 1094-95 (9th Cir. 2001).2

**Outcome:** REVERSED in part, AFFIRMED in part, and REMANDED for further proceedings consistent with this opinion.

These cases here present a dangerous trend of government officials out in public demanding that no person/ natural person or any other entity dare monitor and or record, a state official[s] in the so-called performance of their duties in public. As Chief Justice Margaret Marshall of Massachusetts stated, "Had Michael Hyde, the defendant in this case, been a news reporter he could have faced the same criminal consequences that the court now sanctions". As it turns out, on September 28, 2002, the MBTA police arrested a seasoned reporter Jeff Manzelli. He was charged with illegal wiretap (MGL CH 272 SEC.99) while covering a rally at the Boston Common .He had a large microphone (8 inch) in plain view and was still charged with this wiretap statute .As in the Hyde , Johnson, and Manzelli cases ,the **1st amendment (Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances).**

There are exemptions to the protections of the 1st Amendment such as the defendants expressing their position in their motion to dismiss by inserting unlawful material in their exhibits that possess my SSN and other personal identifiable information that would be used to "aid and abet" criminal activity and to cause financial and Extreme Emotional Distress to the plaintiff .This example is highlighted in the plaintiff's Memorandum for Criminal Sanctions against the defendants. The State and its officials have acted in defiance of the U S Constitution and its Federal Statutes. 11th Amendment immunity is only for lawful capacity . These entities failed that bar by violating the

**14th Amendment (Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws).**

The state officials only use this law to attack people of entities it doesn't like. The was evident in Comm. V. Gerard Rotunda, third. 434MASS.211(2001). A meter maid allowed Rotunda's conversation to be heard by unknown persons at a police station. The meter maid pressing her radio mic switch did this. The prosecutors here used the statements of others at the police station that overheard this conversation as a weapon against Rotunda in a Civil Rights Complaint against him. The actions by the meter maid by the states own definition was a wiretap.

In the case Comm. v. David Mastriano, August 31, 2003, a motorist used a cell phone to call and leave a message on a friend's answering machine during a traffic stop that Officer Mastriano had no knowledge of. Subsequently he was charged with sexually assaulting the motorist. This willful act of selective enforcement of the law is discriminatory in nature .

These actions display a lack of conformity to a law (MGL CH 272 SEC. 99) that is listed as felony act. Violent rape and burglary with a deadly weapon are also felonies. This would mean that some rapes would be prosecuted and some not depending on the police and, or prosecutors involved. This display illustrates a form of class segregation that would be defiant of the officials and could not be reasonably assessed as officials in their official capacity.

By bringing this case against the plaintiff they defy the very purpose of their existence according to their State Constitution (see exhibits 1 and 2). Article 5 essentially says that State Officials are accountable to the people at **all times** (a recording would be an account at one particular point within the concept of all time). Article 7 says that government is instituted for to common good of the people and not its own interests. There is no benefit to the community at-large if the people cannot monitor its government institutions or personnel . For tomorrow the people cannot speak against this institution .                      page 21

Article 10 says that each individual should be compensated for their property if the Commonwealth necessitates its use (see exhibits 17-19). These documents were mailed to offices of Tom Reilly , Mitt Romney, and Edward Flynn of which to this day, they never corresponded with the plaintiff . These documents were in relation to the use of my voice-activated recorder, use of my tape protected by USC Title 17 , and use of my DNA protected by title 17 and Trade Secrets. To willfully use intellectual property as well as any other property without permission is just out-right theft and not part of their official duties. It constitutes embezzlement with extortion.

Article 11 says all persons ought to have remedies to fix a damage to which the offending party compensate the injured .the state has no copyright protection laws to which the Federal law and others listed in the complaint can remedy the situation.

Article 12 says that no one shall be subjected to furnish evidence against him, that a person shall have the right to have materials that can exonerate a subject, and have access of the laws of the land. The commonwealth by taking my tape-recording and destroying it after they used it, denied me of this right. Also "law of the land "constitutes the US Constitution  as in its Supremacy Clause.

11th Amendment (sovereign immunity)

The actions listed in the revised 1st Amended complaint list many actions by the defendants that were unconstitutional and not subject to sovereign immunity. It would be a grave injustice that a life-long citizen of the country to have less rights as to due process and equal protection than others originally from outside the country. Austria v. Altmann Docket Number: 03-13 is an example of a woman , who was processed in all relevant courts in Austria and declined her claim to compensation to intellectual property in the form of paintings  . Altmann comes to the USA and opens a claim aginst a true Sovereign Entity such as Austria . The US Supreme stated that here, in the US ,She can sue Austria for her intellectual property. To say Altman can sue a Sovereign Entity but the plaintiff cannot , as the commonwealth of Massachusetts suggests goes beyond upsured and would be considered completely unholy.

Page 22

As it stands some U S Supreme Court decisions have struck down state laws. The case is *Lawrence and Garner v. Texas*, case no. 02-0102. The Supreme Court struck down a Texas state law banning private consensual sex between adults of the same sex in a decision gay rights groups hailed as historic. The 6-3 decision by the court reverses course from a ruling 17 years ago that states could punish homosexuals for what such laws historically called deviant sex. Hassel said the ruling, based on due process arguments rather than equal protection laws, would push out new areas in privacy. "This is going to carve out protection for private sexual behavior," Hassel said. "As long as it's between consenting adults, this ruling would appear to cover it. The case is Gonzales v. Raich, case no. 03-1454 Even though some states have provisions medical marijuana its still a medicine band citing the Commerce Clause of the Us Constitution **Article I, Section 8, Clause 3** of the United States Constitution, known as the **Commerce Clause**, empowers the United States Congress "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Courts and commentators have tended to discuss each of these three areas as a separate power granted to Congress. It is therefore common to see references to the **Foreign Commerce Clause**, the **Interstate Commerce Clause**, and the **Indian Commerce Clause**, each of which refers to the power granted to Congress in this section.

Another disturbing problem is why the state is willing to fight this so. If this was a case that showed an officer as a hero, the state wouldn't press charges this way. The main reason one can logically deduce is its potential to interfere with state revenue. Imagine if all motorists purchased recording devices that countered what the police say at civil or criminal hearings. It could be a major blow to the revenue enhancing capabilities of the state. In other words money and politics are the driving force here. Not the common good to citizens.

How ever, the Federal government and its programs suffer here in the fact that, if persons are in court fighting tickets, they're not working paying Federal Taxes. The state gets the money. At a

page 23

time when this nation is under major attack from Nature, (hurricanes, floods etc) . The **Supremacy Clause** appears in Article VI of the United States Constitution.  From **Article VI**:

**"This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the authority of the United States, shall be Supreme Law of the land; and the Judges in every state shall be bound thereby, any thing in the Constitution or Laws of any state to the contrary notwithstanding."**
**This coupled with the Spending Clause desion**

### SOUTH DAKOTA v. DOLE, 483 U.S. 203 (1987)

483 U.S. 203

Title 23 U.S.C. 158 (1982 ed., Supp. III) directs the Secretary of Transportation to withhold a percentage of otherwise allocable federal highway funds from States "in which the purchase or public possession . . . of any alcoholic beverage by a person who is less than twenty-one years of age is lawful." South Dakota, which permits persons 19 years old or older to purchase beer containing up to 3.2% alcohol, sued in Federal District Court for a declaratory judgment that 158 violates the constitutional limitations on congressional exercise of the spending power under Art. I, 8, cl. 1, of the Constitution and violates the Twenty-first Amendment. The District Court rejected the State's claims, and the Court of Appeals affirmed.

*Held:*

Even if Congress, in view of the Twenty-first Amendment, might lack the power to impose directly a national minimum drinking age (a question not decided here), 158's indirect encouragement of state action to obtain uniformity in the States' drinking ages is a valid use of the spending power. Pp. 206-212. The defendants attempt to move this Honorable Court by citing HECK v. HUMPHREY, 512

U.S.477 (1994). There are multiple faults with this application by the defendants' motion to

dismiss on this example. First, the plaintiff filed his Federal Civil Complaint (No. 04-12429-RWZ)

on November 17, 2004. Roy Heck filed his complaint after his conviction for voluntary

manslaughter. Second, the act of voluntary manslaughter doesn't seem to be protected by any

federal statue under / any United States Code. There was no conflict with any Federal law to the

State law with regard to voluntary murder. In summery to the Heck case, Roy Heck performed an

illegal act (murder) that was in the sole jurisdiction of the state and didn't conflict with any federal

laws regarding this type of murder.  These factors in the Heck case are significant and disqualify

defendant's motion to dismiss under the Heck case. Under MGL Ch 272 sec. 99, of which the plaintiff was charged, the defendants claim the wiretap statute was violated when a voice-activated recorder was, as the defendants allege, to be in operation during a brutal interrogation done at gunpoint. This recorder is FCC regulated and was claimed to have been in operation on Rt 128 North (a Federally Funded highway) .The jurisdiction in this matter is that of the federal courts and the United States of America. The Federal wiretap statute under US Code Title 18 section 2511 preempts state law here. Citing the Supremacy Clause, it states that state law must yield to federal law if the federal government intends to "occupy the field". The Federal Government uses this wiretap statute as a means of national security and would be severely handy-capped if state law conflicted in any way with this tool in part or entirely.

This would not be the first time the Supremacy Clause preempted state law. In June19, 2000 ruling, the US Supreme Court struck down as unconstitutional a Massachusetts state law (the "Burma law") barring state entities from buying goods or services from companies that did business with Burma (Myanmar). The court ruled that the Burma law is "invalid under the Supremacy Clause of the National Constitution owing to its threat of frustrating federal statutory objectives." The Supremacy Clause states that state law must yield to federal law if the federal government intends to "occupy the field." Massachusetts enacted the law in 1996. Subsequently, the US Congress imposed sanctions on Burma. The National Foreign Trade Commission (FTC) thus attempted to have the Massachusetts law declared invalid, as a comparable federal law was now in place. The US Supreme Court on March 23, 2000 heard arguments in the appeal by the state of Massachusetts against the FTC.

The US Constitution's Commerce Clause also is power-presents here. Another discrepancy with the Heck case is the fact that US Congress has authority under the US Constitution's Commerce

Clause with respect to products and services to control trade that is conducted in any state or

states. This is also very damning to the defendants use of Heck because intellectual property (a

documentary of A Day In The Life of Michael J Hyde) and the Plaintiff's DNA is protected under

US Code Title 17 which is considered an occupied field of the Federal Government while traveling

about a Federally Funded Interstate Highway.

This act of recording a person[s] own speech is also protected by the 1st Amendment  and thus
protedted by The Civil Rights Act. The US Supreme Court so ruled under

```
   In summery to the defendants' use of Heck was preempted by
Plaintiff's Federal Civil Complaint prior to the states
ascertaining of a guilty plea (by 1 week). Also USC Title 18
section 2511 exemption 2d (It shall not be unlawful under this
chapter for a person not acting under color of law to intercept
a wire, oral, or electronic
communication where such person is a party to the communication
or
where one of the parties to the communication has given prior
consent to such interception unless such communication is
intercepted for the purpose of committing any criminal or
tortious
act in violation of the Constitution or laws of the United
States
or of any State.
```

In short the state statute MGL 272 sec 99 defies reason (see exhibits 3-15) and

clashes with many Federal logistics (see exhibit 16) . Plaintiff respectfully moves the court

to deny defendants motion to dismiss .


Respectfully submitted

Michael J Hyde

148 Brickel Rd

Stoughton, Ma, 02072

**Phone # 781-341-4299**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

MICHAEL HYDE
 Plaintiff,

V.

Civil Action No.04-12429-RWZ

STATES OF MASSACHUSETTS ET AL.,
 Defendents

LIST of EXHHIBITS 1-19

EXHHIBIT 1-2: MASSACHUSETTS STATE CONSTITUTION Declaration of Rights

 EXHHIBIT 3-15: MGL CH 272 SEC.99

EXHHIBIT 16: USC Title 42 Sec. 2000d-7 Civil Rights remedies equalization

EXHHIBIT 17: Warning

EXHHIBIT 18: Warning notice

EXHHIBIT 19: ATTENTION

Respectfully submitted,
Michael J Hyde
148 Brickel Rd.
Stoughton, MA 02072

PART THE FIRST
A Declaration of the Rights of the Inhabitants
of the Commonwealth of Massachusetts.


Article V. All power residing originally in the people, and being derived from them, the several magistrates and officers of
government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times
accountable to them.


Article VII. Government is instituted for the common good; for the protection, safety, prosperity and happiness of the people; and
not for the profit, honor, or private interest of any one man, family, or class of men: Therefore the people alone have an
incontestable, unalienable, and indefeasible right to institute government; and to reform, alter, or totally change the same, when
their protection, safety, prosperity and happiness require it.


Article X. Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according
to standing laws. He is obliged, consequently, to contribute his share to the expense of this protection; to give his personal service,
or an equivalent, when necessary: but no part of the property of any individual can, with justice, be taken from him, or applied to
public uses, without his own consent, or that of the representative body of the people. In fine, the people of this commonwealth are
not controllable by any other laws than those to which their constitutional representative body have given their consent. And
whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a
reasonable compensation therefore


Article XI. Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or
wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely, and without being
obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

Page 1

exhibit 1

.

Article XII. No subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and
formally, described to him; or be compelled to accuse, or furnish evidence against himself. And every subject shall have a right to
produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his
defence by himself, or his counsel, at his election. And no subject shall be arrested, imprisoned, despoiled, or deprived of his
property, immunities, or privileges, put out of the protection of the law, exiled, or deprived of his life, liberty, or estate, but by the
judgment of his peers, or the law of the land.

Page 2

e X h i b i t 2

# GENERAL LAWS OF MASSACHUSETTS

## PART IV.
### CRIMES, PUNISHMENTS AND PROCEEDINGS IN CRIMINAL CASES

## TITLE I.
### CRIMES AND PUNISHMENTS

**CHAPTER 272.** CRIMES AGAINST CHASTITY, MORALITY, DECENCY AND GOOD ORDER

### Chapter 272: Section 99 Interception of wire and oral communications

Section 99. Interception of wire and oral communications.--

A. Preamble.

The general court finds that organized crime exists within the commonwealth and that the increasing activities of organized crime constitute a grave danger to the public welfare and safety. Organized crime, as it exists in the commonwealth today, consists of a continuing conspiracy among highly organized and disciplined groups to engage in supplying illegal goods and services. In supplying these goods and services organized crime commits unlawful acts and employs brutal and violent tactics. Organized crime is infiltrating legitimate business activities and depriving honest businessmen of the right to make a living.

The general court further finds that because organized crime carries on its activities through layers of insulation and behind a wall of secrecy, government has been unsuccessful in curtailing and eliminating it. Normal investigative procedures are not effective in the investigation of illegal acts committed by organized crime. Therefore, law enforcement officials must be permitted to use modern methods of electronic surveillance, under strict judicial supervision, when investigating these organized criminal activities.

The general court further finds that the uncontrolled development and unrestricted use of modern electronic surveillance devices pose grave dangers to the privacy of all citizens of the commonwealth. Therefore, the secret use of such devices by private individuals must be prohibited. The use of such devices by law enforcement officials must be conducted under strict judicial supervision and should be limited to the investigation of organized crime.

B. Definitions. As used in this section--

1. The term ""wire communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception.

2. The term ""oral communication" means speech, except such speech as is transmitted over the public air waves by radio or other similar device.

exhibit 3

3. The term ""intercepting device" means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication other than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business.

4. The term ""interception" means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication; provided that it shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined herein.

5. The term ""contents", when used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication.

6. The term ""aggrieved person" means any individual who was a party to an intercepted wire or oral communication or who was named in the warrant authorizing the interception, or who would otherwise have standing to complain that his personal or property interest or privacy was invaded in the course of an interception.

7. The term ""designated offense" shall include the following offenses in connection with organized crime as defined in the preamble: arson, assault and battery with a dangerous weapon, extortion, bribery, burglary, embezzlement, forgery, gaming in violation of section seventeen of chapter two hundred and seventy-one of the general laws, intimidation of a witness or juror, kidnapping, larceny, lending of money or things of value in violation of the general laws, mayhem, murder, any offense involving the possession or sale of a narcotic or harmful drug, perjury, prostitution, robbery, subornation of perjury, any violation of this section, being an accessory to any of the foregoing offenses and conspiracy or attempt or solicitation to commit any of the foregoing offenses.

8. The term ""investigative or law enforcement officer" means any officer of the United States, a state or a political subdivision of a state, who is empowered by law to conduct investigations of, or to make arrests for, the designated offenses, and any attorney authorized by law to participate in the prosecution of such offenses.

9. The term ""judge of competent jurisdiction" means any justice of the superior court of the commonwealth.

10. The term ""chief justice" means the chief justice of the superior court of the commonwealth.

$$Exhibit\ 4$$

11. The term ""issuing judge" means any justice of the superior court who shall issue a warrant as provided herein or in the event of his disability or unavailability any other judge of competent jurisdiction designated by the chief justice.

12. The term ""communication common carrier" means any person engaged as a common carrier in providing or operating wire communication facilities.

13. The term ""person" means any individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent or employee of the United States, a state, or a political subdivision of a state.

14. The terms ""sworn" or ""under oath" as they appear in this section shall mean an oath or affirmation or a statement subscribed to under the pains and penalties of perjury.

15. The terms ""applicant attorney general" or ""applicant district attorney" shall mean the attorney general of the commonwealth or a district attorney of the commonwealth who has made application for a warrant pursuant to this section.

16. The term ""exigent circumstances" shall mean the showing of special facts to the issuing judge as to the nature of the investigation for which a warrant is sought pursuant to this section which require secrecy in order to obtain the information desired from the interception sought to be authorized.

17. The term ""financial institution" shall mean a bank, as defined in section 1 of chapter 167, and an investment bank, securities broker, securities dealer, investment adviser, mutual fund, investment company or securities custodian as defined in section 1.165-12(c)(1) of the United States Treasury regulations.

18. The term ""corporate and institutional trading partners" shall mean financial institutions and general business entities and corporations which engage in the business of cash and asset management, asset management directed to custody operations, securities trading, and wholesale capital markets including foreign exchange, securities lending, and the purchase, sale or exchange of securities, options, futures, swaps, derivatives, repurchase agreements and other similar financial instruments with such financial institution.

C. Offenses.

1. Interception, oral communications prohibited.

Except as otherwise specifically provided in this section any person who--

willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars, or imprisoned in the state prison for not more than five years, or imprisoned in a jail or house of correction for not more than two and one half years, or both so fined and given one such imprisonment.



Proof of the installation of any intercepting device by any person under circumstances evincing an intent to commit an interception, which is not authorized or permitted by this section, shall be prima facie evidence of a violation of this subparagraph.

2. Editing of tape recordings in judicial proceeding prohibited.

Except as otherwise specifically provided in this section any person who willfully edits, alters or tampers with any tape, transcription or recording of oral or wire communications by any means, or attempts to edit, alter or tamper with any tape, transcription or recording of oral or wire communications by any means with the intent to present in any judicial proceeding or proceeding under oath, or who presents such recording or permits such recording to be presented in any judicial proceeding or proceeding under oath, without fully indicating the nature of the changes made in the original state of the recording, shall be fined not more than ten thousand dollars or imprisoned in the state prison for not more than five years or imprisoned in a jail or house of correction for not more than two years or both so fined and given one such imprisonment.

3. Disclosure or use of wire or oral communications prohibited.

Except as otherwise specifically provided in this section any person who--

a. willfully discloses or attempts to disclose to any person the contents of any wire or oral communication, knowing that the information was obtained through interception; or

b. willfully uses or attempts to use the contents of any wire or oral communication, knowing that the information was obtained through interception, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

4. Disclosure of contents of applications, warrants, renewals, and returns prohibited.

Except as otherwise specifically provided in this section any person who--

willfully discloses to any person, any information concerning or contained in, the application for, the granting or denial of orders for interception, renewals, notice or return on an ex parte order granted pursuant to this section, or the contents of any document, tape, or recording kept in accordance with paragraph N, shall be guilty of a misdemeanor punishable by imprisonment in a jail or a house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

5. Possession of interception devices prohibited.

A person who possesses any intercepting device under circumstances evincing an intent to commit an interception not permitted or authorized by this section, or a person who permits an intercepting device to be used or employed for an interception not permitted or authorized by this section, or a person who possesses an intercepting device knowing that the same is intended to be used to commit an interception not permitted or authorized by this section, shall be guilty of a misdemeanor punishable

Exhibit 6

by imprisonment in a jail or house of correction for not more than two years or by a fine of not more than five thousand dollars or both.

The installation of any such intercepting device by such person or with his permission or at his direction shall be prima facie evidence of possession as required by this subparagraph.

6. Any person who permits or on behalf of any other person commits or attempts to commit, or any person who participates in a conspiracy to commit or to attempt to commit, or any accessory to a person who commits a violation of subparagraphs 1 through 5 of paragraph C of this section shall be punished in the same manner as is provided for the respective offenses as described in subparagraphs 1 through 5 of paragraph C.

D. Exemptions.

1. Permitted interception of wire or oral communications.

It shall not be a violation of this section--

a. for an operator of a switchboard, or an officer, employee, or agent of any communication common carrier, whose facilities are used in the transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of service or to the protection of the rights or property of the carrier of such communication, or which is necessary to prevent the use of such facilities in violation of section fourteen A of chapter two hundred and sixty-nine of the general laws; provided, that said communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

b. for persons to possess an office intercommunication system which is used in the ordinary course of their business or to use such office intercommunication system in the ordinary course of their business.

c. for investigative and law enforcement officers of the United States of America to violate the provisions of this section if acting pursuant to authority of the laws of the United States and within the scope of their authority.

d. for any person duly authorized to make specified interceptions by a warrant issued pursuant to this section.

e. for investigative or law enforcement officers to violate the provisions of this section for the purposes of ensuring the safety of any law enforcement officer or agent thereof who is acting in an undercover capacity, or as a witness for the commonwealth; provided, however, that any such interception which is not otherwise permitted by this section shall be deemed unlawful for purposes of paragraph P.

f. for a financial institution to record telephone communications with its corporate or institutional trading partners in the ordinary course of its business; provided, however, that such financial institution shall establish and maintain a procedure to provide semi-annual written notice to its


Exhibit 7

corporate and institutional trading partners that telephone communications over designated lines will be recorded.

2. Permitted disclosure and use of intercepted wire or oral communications.

a. Any investigative or law enforcement officer, who, by any means authorized by this section, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents or evidence in the proper performance of his official duties.

b. Any investigative or law enforcement officer, who, by any means authorized by this section has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may use such contents or evidence in the proper performance of his official duties.

c. Any person who has obtained, by any means authorized by this section, knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents while giving testimony under oath or affirmation in any criminal proceeding in any court of the United States or of any state or in any federal or state grand jury proceeding.

d. The contents of any wire or oral communication intercepted pursuant to a warrant in accordance with the provisions of this section, or evidence derived therefrom, may otherwise be disclosed only upon a showing of good cause before a judge of competent jurisdiction.

e. No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this section shall lose its privileged character.

E. Warrants: when issuable:

A warrant may issue only:

1. Upon a sworn application in conformity with this section; and

2. Upon a showing by the applicant that there is probable cause to believe that a designated offense has been, is being, or is about to be committed and that evidence of the commission of such an offense may thus be obtained or that information which will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense may thus be obtained; and

3. Upon a showing by the applicant that normal investigative procedures have been tried and have failed or reasonably appear unlikely to succeed if tried.

F. Warrants: application.

1. Application. The attorney general, any assistant attorney general specially designated by the attorney general, any district attorney, or any assistant district attorney specially designated by the district attorney may apply ex parte to a judge of competent jurisdiction for a warrant to intercept wire



Exhibit 8

or oral communications. Each application ex parte for a warrant must be in writing, subscribed and sworn to by the applicant authorized by this subparagraph.

2. The application must contain the following:

a. A statement of facts establishing probable cause to believe that a particularly described designated offense has been, is being, or is about to be committed; and

b. A statement of facts establishing probable cause to believe that oral or wire communications of a particularly described person will constitute evidence of such designated offense or will aid in the apprehension of a person who the applicant has probable cause to believe has committed, is committing, or is about to commit a designated offense; and

c. That the oral or wire communications of the particularly described person or persons will occur in a particularly described place and premises or over particularly described telephone or telegraph lines; and

d. A particular description of the nature of the oral or wire communications sought to be overheard; and

e. A statement that the oral or wire communications sought are material to a particularly described investigation or prosecution and that such conversations are not legally privileged; and

f. A statement of the period of time for which the interception is required to be maintained. If practicable, the application should designate hours of the day or night during which the oral or wire communications may be reasonably expected to occur. If the nature of the investigation is such that the authorization for the interception should not automatically terminate when the described oral or wire communications have been first obtained, the application must specifically state facts establishing probable cause to believe that additional oral or wire communications of the same nature will occur thereafter; and

g. If it is reasonably necessary to make a secret entry upon a private place and premises in order to install an intercepting device to effectuate the interception, a statement to such effect; and

h. If a prior application has been submitted or a warrant previously obtained for interception of oral or wire communications, a statement fully disclosing the date, court, applicant, execution, results, and present status thereof; and

i. If there is good cause for requiring the postponement of service pursuant to paragraph L, subparagraph 2, a description of such circumstances, including reasons for the applicant's belief that secrecy is essential to obtaining the evidence or information sought.

3. Allegations of fact in the application may be based either upon the personal knowledge of the applicant or upon information and belief. If the applicant personally knows the facts alleged, it must be so stated. If the facts establishing such probable cause are derived in whole or part from the statements of persons other than the applicant, the sources of such information and belief must be either disclosed

EX hibit 9

or described; and the application must contain facts establishing the existence and reliability of any informant and the reliability of the information supplied by him. The application must also state, so far as possible, the basis of the informant's knowledge or belief. If the applicant's information and belief is derived from tangible evidence or recorded oral evidence, a copy or detailed description thereof should be annexed to or included in the application. Affidavits of persons other than the applicant may be submitted in conjunction with the application if they tend to support any fact or conclusion alleged therein. Such accompanying affidavits may be based either on personal knowledge of the affiant or information and belief, with the source thereof, and reason therefor, specified.

G. Warrants: application to whom made.

Application for a warrant authorized by this section must be made to a judge of competent jurisdiction in the county where the interception is to occur, or the county where the office of the applicant is located, or in the event that there is no judge of competent jurisdiction sitting in said county at such time, to a judge of competent jurisdiction sitting in Suffolk County; except that for these purposes, the office of the attorney general shall be deemed to be located in Suffolk County.

H. Warrants: application how determined.

1. If the application conforms to paragraph F, the issuing judge may examine under oath any person for the purpose of determining whether probable cause exists for the issuance of the warrant pursuant to paragraph E. A verbatim transcript of every such interrogation or examination must be taken, and a transcription of the same, sworn to by the stenographer, shall be attached to the application and be deemed a part thereof.

2. If satisfied that probable cause exists for the issuance of a warrant the judge may grant the application and issue a warrant in accordance with paragraph I. The application and an attested copy of the warrant shall be retained by the issuing judge and transported to the chief justice of the superior court in accordance with the provisions of paragraph N of this section.

3. If the application does not conform to paragraph F, or if the judge is not satisfied that probable cause has been shown sufficient for the issuance of a warrant, the application must be denied.

I. Warrants: form and content.

A warrant must contain the following:

1. The subscription and title of the issuing judge; and

2. The date of issuance, the date of effect, and termination date which in no event shall exceed thirty days from the date of effect. The warrant shall permit interception of oral or wire communications for a period not to exceed fifteen days. If physical installation of a device is necessary, the thirty-day period shall begin upon the date of installation. If the effective period of the warrant is to terminate upon the acquisition of particular evidence or information or oral or wire communication, the warrant shall so provide; and

$EX h.b.t 10$

3. A particular description of the person and the place, premises or telephone or telegraph line upon which the interception may be conducted; and

4. A particular description of the nature of the oral or wire communications to be obtained by the interception including a statement of the designated offense to which they relate; and

5. An express authorization to make secret entry upon a private place or premises to install a specified intercepting device, if such entry is necessary to execute the warrant; and

6. A statement providing for service of the warrant pursuant to paragraph L except that if there has been a finding of good cause shown requiring the postponement of such service, a statement of such finding together with the basis therefor must be included and an alternative direction for deferred service pursuant to paragraph L, subparagraph 2.

J. Warrants: renewals.

1. Any time prior to the expiration of a warrant or a renewal thereof, the applicant may apply to the issuing judge for a renewal thereof with respect to the same person, place, premises or telephone or telegraph line. An application for renewal must incorporate the warrant sought to be renewed together with the application therefor and any accompanying papers upon which it was issued. The application for renewal must set forth the results of the interceptions thus far conducted. In addition, it must set forth present grounds for extension in conformity with paragraph F, and the judge may interrogate under oath and in such an event a transcript must be provided and attached to the renewal application in the same manner as is set forth in subparagraph 1 of paragraph H.

2. Upon such application, the judge may issue an order renewing the warrant and extending the authorization for a period not exceeding fifteen (15) days from the entry thereof. Such an order shall specify the grounds for the issuance thereof. The application and an attested copy of the order shall be retained by the issuing judge to be transported to the chief justice in accordance with the provisions of subparagraph N of this section. In no event shall a renewal be granted which shall terminate later than two years following the effective date of the warrant.

K. Warrants: manner and time of execution.

1. A warrant may be executed pursuant to its terms anywhere in the commonwealth.

2. Such warrant may be executed by the authorized applicant personally or by any investigative or law enforcement officer of the commonwealth designated by him for the purpose.

3. The warrant may be executed according to its terms during the hours specified therein, and for the period therein authorized, or a part thereof. The authorization shall terminate upon the acquisition of the oral or wire communications, evidence or information described in the warrant. Upon termination of the authorization in the warrant and any renewals thereof, the interception must cease at once, and any device installed for the purpose of the interception must be removed as soon thereafter as practicable. Entry upon private premises for the removal of such device is deemed to be authorized by the warrant.


Exhibit 11

L. Warrants: service thereof.

1. Prior to the execution of a warrant authorized by this section or any renewal thereof, an attested copy of the warrant or the renewal must, except as otherwise provided in subparagraph 2 of this paragraph, be served upon a person whose oral or wire communications are to be obtained, and if an intercepting device is to be installed, upon the owner, lessee, or occupant of the place or premises, or upon the subscriber to the telephone or owner or lessee of the telegraph line described in the warrant.

2. If the application specially alleges exigent circumstances requiring the postponement of service and the issuing judge finds that such circumstances exist, the warrant may provide that an attested copy thereof may be served within thirty days after the expiration of the warrant or, in case of any renewals thereof, within thirty days after the expiration of the last renewal; except that upon a showing of important special facts which set forth the need for continued secrecy to the satisfaction of the issuing judge, said judge may direct that the attested copy of the warrant be served on such parties as are required by this section at such time as may be appropriate in the circumstances but in no event may he order it to be served later than three (3) years from the time of expiration of the warrant or the last renewal thereof. In the event that the service required herein is postponed in accordance with this paragraph, in addition to the requirements of any other paragraph of this section, service of an attested copy of the warrant shall be made upon any aggrieved person who should reasonably be known to the person who executed or obtained the warrant as a result of the information obtained from the interception authorized thereby.

3. The attested copy of the warrant shall be served on persons required by this section by an investigative or law enforcement officer of the commonwealth by leaving the same at his usual place of abode, or in hand, or if this is not possible by mailing the same by certified or registered mail to his last known place of abode. A return of service shall be made to the issuing judge, except, that if such service is postponed as provided in subparagraph 2 of paragraph L, it shall be made to the chief justice. The return of service shall be deemed a part of the return of the warrant and attached thereto.

M. Warrant: return.

Within seven days after termination of the warrant or the last renewal thereof, a return must be made thereon to the judge issuing the warrant by the applicant therefor, containing the following:

a. a statement of the nature and location of the communications facilities, if any, and premise or places where the interceptions were made; and

b. the periods of time during which such interceptions were made; and

c. the names of the parties to the communications intercepted if known; and

d. the original recording of the oral or wire communications intercepted, if any; and

e. a statement attested under the pains and penalties of perjury by each person who heard oral or wire communications as a result of the interception authorized by the warrant, which were not recorded,

Exhibit 12

stating everything that was overheard to the best of his recollection at the time of the execution of the statement.

N. Custody and secrecy of papers and recordings made pursuant to a warrant.

1. The contents of any wire or oral communication intercepted pursuant to a warrant issued pursuant to this section shall, if possible, be recorded on tape or wire or other similar device. Duplicate recordings may be made for use pursuant to subparagraphs 2 (a) and (b) of paragraph D for investigations. Upon examination of the return and a determination that it complies with this section, the issuing judge shall forthwith order that the application, all renewal applications, warrant, all renewal orders and the return thereto be transmitted to the chief justice by such persons as he shall designate. Their contents shall not be disclosed except as provided in this section. The application, renewal applications, warrant, the renewal order and the return or any one of them or any part of them may be transferred to any trial court, grand jury proceeding of any jurisdiction by any law enforcement or investigative officer or court officer designated by the chief justice and a trial justice may allow them to be disclosed in accordance with paragraph D, subparagraph 2, or paragraph O or any other applicable provision of this section.

The application, all renewal applications, warrant, all renewal orders and the return shall be stored in a secure place which shall be designated by the chief justice, to which access shall be denied to all persons except the chief justice or such court officers or administrative personnel of the court as he shall designate.

2. Any violation of the terms and conditions of any order of the chief justice, pursuant to the authority granted in this paragraph, shall be punished as a criminal contempt of court in addition to any other punishment authorized by law.

3. The application, warrant, renewal and return shall be kept for a period of five (5) years from the date of the issuance of the warrant or the last renewal thereof at which time they shall be destroyed by a person designated by the chief justice. Notice prior to the destruction shall be given to the applicant attorney general or his successor or the applicant district attorney or his successor and upon a showing of good cause to the chief justice, the application, warrant, renewal, and return may be kept for such additional period as the chief justice shall determine but in no event longer than the longest period of limitation for any designated offense specified in the warrant, after which time they must be destroyed by a person designated by the chief justice.

O. Introduction of evidence.

1. Notwithstanding any other provisions of this section or any order issued pursuant thereto, in any criminal trial where the commonwealth intends to offer in evidence any portions of the contents of any interception or any evidence derived therefrom the defendant shall be served with a complete copy of each document and item which make up each application, renewal application, warrant, renewal order, and return pursuant to which the information was obtained, except that he shall be furnished a copy of any recording instead of the original. The service must be made at the arraignment of the defendant or, if a period in excess of thirty (30) days shall elapse prior to the commencement of the trial of the defendant, the service may be made at least thirty (30) days before the commencement of the criminal

$EXhibit$ 13

trial. Service shall be made in hand upon the defendant or his attorney by any investigative or law enforcement officer of the commonwealth. Return of the service required by this subparagraph including the date of service shall be entered into the record of trial of the defendant by the commonwealth and such return shall be deemed prima facie evidence of the service described therein. Failure by the commonwealth to make such service at the arraignment, or if delayed, at least thirty days before the commencement of the criminal trial, shall render such evidence illegally obtained for purposes of the trial against the defendant; and such evidence shall not be offered nor received at the trial notwithstanding the provisions of any other law or rules of court.

2. In any criminal trial where the commonwealth intends to offer in evidence any portions of a recording or transmission or any evidence derived therefrom, made pursuant to the exceptions set forth in paragraph B, subparagraph 4, of this section, the defendant shall be served with a complete copy of each recording or a statement under oath of the evidence overheard as a result of the transmission. The service must be made at the arraignment of the defendant or if a period in excess of thirty days shall elapse prior to the commencement of the trial of the defendant, the service may be made at least thirty days before the commencement of the criminal trial. Service shall be made in hand upon the defendant or his attorney by any investigative or law enforcement officer of the commonwealth. Return of the service required by this subparagraph including the date of service shall be entered into the record of trial of the defendant by the commonwealth and such return shall be deemed prima facie evidence of the service described therein. Failure by the commonwealth to make such service at the arraignment, or if delayed at least thirty days before the commencement of the criminal trial, shall render such service illegally obtained for purposes of the trial against the defendant and such evidence shall not be offered nor received at the trial notwithstanding the provisions of any other law or rules of court.

P. Suppression of evidence.

Any person who is a defendant in a criminal trial in a court of the commonwealth may move to suppress the contents of any intercepted wire or oral communication or evidence derived therefrom, for the following reasons:

1. That the communication was unlawfully intercepted.

2. That the communication was not intercepted in accordance with the terms of this section.

3. That the application or renewal application fails to set forth facts sufficient to establish probable cause for the issuance of a warrant.

4. That the interception was not made in conformity with the warrant.

5. That the evidence sought to be introduced was illegally obtained.

6. That the warrant does not conform to the provisions of this section.

Q. Civil remedy.

$E \times h i b i t \ 14$

Any aggrieved person whose oral or wire communications were intercepted, disclosed or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications or who so violates his personal, property or privacy interest, and shall be entitled to recover from any such person--

1. actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher;

2. punitive damages; and

3. a reasonable attorney's fee and other litigation disbursements reasonably incurred. Good faith reliance on a warrant issued under this section shall constitute a complete defense to an action brought under this paragraph.

R. Annual report of interceptions of the general court.

On the second Friday of January, each year, the attorney general and each district attorney shall submit a report to the general court stating (1) the number of applications made for warrants during the previous year, (2) the name of the applicant, (3) the number of warrants issued, (4) the effective period for the warrants, (5) the number and designation of the offenses for which those applications were sought, and for each of the designated offenses the following: (a) the number of renewals, (b) the number of interceptions made during the previous year, (c) the number of indictments believed to be obtained as a result of those interceptions, (d) the number of criminal convictions obtained in trials where interception evidence or evidence derived therefrom was introduced. This report shall be a public document and be made available to the public at the offices of the attorney general and district attorneys. In the event of failure to comply with the provisions of this paragraph any person may compel compliance by means of an action of mandamus.

$EXhibit$ 15

## § 2000d–7. Civil rights remedies equalization

*Release date: 2005-02-25*

### (a) General provision

**(1)** A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

**(2)** In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

### (b) Effective date

The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or in part after October 21, 1986

Exhibit 16

# WARNING

The use of any and all forms of intellectual property relating to Michael J Hyde is protected under Federal and International Law. Any use of this property without prior consent is in violation of United States Code Title 17 and the Berne Copyright Treaty. This warning is not designed to give amnesty to any entities that has violated these laws and others that are not listed here, this is merely a formal notice letting you know what can happen. It is up to the person(s) or entities that wish to utilize this property to contact its creator, Michael J Hyde. Because of the nature of how this property was taken with out permission and with a firearm drawn on it's creator on a Federally funded Interstate Highway, other laws may apply including the RICO STATUTE.

Intellectual property of Michael J Hyde includes any and all representations of his images, sounds, thoughts weather past, present and future. Images include photos, video, medical films, tattoos, DNA, visual costumes or characters, fingerprints, staged performances, in essence all visual data that is identified as Michael J Hyde. Sounds include devices used to make a musical performance and or sound recording, vocal recordings for music, dialog to a live performance, any character created sonically or vocally, documentaries such as A Day In The Life OF Michael J Hyde, in essence all sounds identified as that of Michael J Hyde. Thoughts include all creative concepts abstract and or concrete that are fixed to a tangible format such as a photo, micro cassette, compact disc, electronic storage device, etc.

Michael J Hyde reserves all rights to all forms of intellectual property created by Michael J Hyde unless otherwise specified in writing. Unless otherwise specified to use, copy, or have anything to do with this property be aware that to use this intellectual property, it has a value affixed to it of $230,000,000 (two hundred thirty million U S dollars) However if this intellectual property is used prier to Michael J Hyde receiving the payment specified with intent to harm and causes injury to Michael J Hyde such as physical, mental, legal or any other detrimental harm to Michael J Hyde, the affixed value will now be $230,000,000,000 (two hundred thirty billion U S dollars). Michael J Hyde has the right to employ the use of any Federal or International laws that pertain to recovering damages to commercial value of any and all intellectual property. Also Michael J Hyde has the right to incorporate any foreign entities and or persons to file suit in foreign courts including Europe on his behalf. Please note, the U S Supreme has allowed a lawsuit to be filed in U S District Court in the case of Austria v Altmann which deals with intellectual property stated over $100 million dollars. This legal road is a two way street in which many countries may want to travel and the intellectual property of Michael J Hyde may be a fine vehicle for Europe to travel on.

If the cost of the property seems expensive in excess in which you are willing to spend, then it is suggested that you cease and desist from use and possession of this property. Furthermore the application may seem selective but it is not intended that way and is no excuse to violate copyright laws that protect the property of Michael J Hyde.

This Warning Letter is intellectual property of Michael J Hyde and is not to be copied or reproduced without prier consent of Michael J Hyde. Thank you for your attention in this matter as im sure that if you wish to contact Michael J Hyde feel free to ask any questions at address 148 Brickel Rd Stoughton Ma 02072 or call phone # 1- 781 341- 4299. Thank You. Mike Hyde.                                    Exhibit 17

# WARNING NOTICE

Any and all persons and or entities that wish to use my services or products must pay up front. This includes all DNA, photographs, fingerprints, and or any related documentation related to Michael J Hyde. This notice is a formal warning that cannot be signed away unless payment is received in full to Michael J Hyde. The State of Massachusetts and persons acting as its officers and or employees have stated a demand for my DNA, finger prints and other products of Michael J Hyde as a State Court order that seem to be in violation of State law, the State Constitution, Federal Law, the US Constitution and International Law.

Due to the fact that Michael J Hyde is a manufacturing plant of his DNA, fingerprints, and other created identifiable concepts and or products of Michael J Hyde, this would be a violation of Patient Law as well as a violation of TRADE SECRETS. Entities that are employed by the State and use my tax dollars as payment are my employees and by my rights as the legal guardian of myself, shell not receive freely any products, DNA. Any disclosure forced by the State of Massachusetts would be viewed as a violation of Patent infringement and a violation of TRADE SECRETS in Federal Court and other Courts across the globe.

The State Court has made a troubling demand for my products. By demanding my DNA and or finger prints, my 4th, 5th, and 13th US Constitutional Amendments to name just a few are violated .The State has demanded that I, against my freewill and under duress due to a State law that violates other Federal and International laws as well as the State and Federal Constitutional provisions, I must submit a DNA sample to the State Government of Massachusetts by FEB 18, 2005.As for property taken for public use, I see compensation to the amount of $1,000,000,000 [one billion US dollars] before FEB 18 ,2005 or $1,000,000,000,000 [ one trillion US dollars ] after FEB 18 , 2005. This figure is doubled due to the violation of the TRADE SECRETS and Patent Law violations. This figure can be negotiated but its up to the State of Massachusetts to call out to me with no direct or indirect threats to myself or finances, incarceration or any other State retaliatory activities. Any agreement that are and will be signed that do not benefit Michael J Hyde and or designed to protect the State from any legal, Constitutional, or financial responsibility shall be deemed as signed under duress and shell not be considered legally binding.

Thank you for your time in this matter .I do hope to here from you in the near future, before Feb 18, 2005. Contact me at 148 Brickel Rd, Stoughton, MA 02072 or call at 781-341-4299. Thank you. Michael J Hyde.

Exhibit 18

# ATTENTION

Figure 1

I, Michael J Hyde, am writing this formal letter to let you know that your state agencies have in their possession an office device (voice activated recorder) that is located at the Framingham State Police station. This device is in use at this state agency without compensation to the alleged owner Michael J Hyde. This exercise of the State without compensation is in violation of State Constitution (Article 1, 12 and 14) and United States Constitution (4th and 5th) Amendments just to name a few.

The recorder has been in the states possession since February 15, 2003 and is built up late fees and interest charges. As of now being the date September 4, 2004, the total charges are $5550.00 US dollars. This breaks down to $7.50 a day at 566 days plus $20 overdue charges per month (19 months) plus 20% interest. Be aware that the daily rental fee will increase September 13th to $10.50 daily with the monthly overdue charges to $25.00 and interest charges to be set to 21.5%.

It is imperative that this situation receives closure as to alleviate a complex situation from expanding to other legal and vastly more costly avenues. Please feel free to contact me at (home 781 341 4299), (work 617 697 8893) or write to Michael J Hyde at 148 Brickel Rd, Stoughton, MA, 02072

This Attention Letter is intellectual property of Michael J Hyde and is protected by US Code Title 17 and other international treaties relating to intellectual property and is not to be copied  or reproduced unless specified by Michael J Hyde.

Thank you for your attention, Michael J Hyde.

Exhibit 19